**Barbara Jean BERRY, et al., Plaintiffs-Appellees,**

v.

**SCHOOL DISTRICT OF the CITY OF BENTON HARBOR, et al., Defendants-Appellees,**

and

**Michigan Education Association, Intervening Defendant-Appellant.**

No. 85-1240.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 16, 1986.

Decided Sept. 29, 1986.

Arthur R. Przybylowicz, Timothy P. Greeley (argued), Foster, Swift, Collins & Coey, P.C., Lansing, Mich., for appellant.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., Michael H. Sussman (argued), Sussman & Sussman, Yonkers, N.Y., for appellees.

Before MERRITT and WELLFORD, Circuit Judges; and EDWARDS, Senior Circuit Judge.

MERRITT, Circuit Judge.

This is an appeal by the Michigan Education Association from a continuing order of the District Court which, as part of an inter-district school desegregation plan, indefinitely prohibits the layoff of any black

---

* The Honorable Samuel H. Bell, United States District Judge for the Northern District of Ohio, sitting by designation.

teachers, thereby suspending application of the Michigan Teacher Tenure Act, M.C.L.A. § 38.71, *et seq.*, and certain provisions of an existing collective bargaining agreement. For the reasons set forth below, we vacate only that portion of the District Court's order which flatly prohibits laying off any black teachers.

## I.

This desegregation case is once again before this Court. In 1967 plaintiffs, black school children from the Benton Harbor School District, filed an action in U.S. District Court for the Western District of Michigan alleging, *inter alia,* that the predominantly black Benton Harbor Schools were segregated in violation of the Fourteenth Amendment. (*See,* Appendix, 50A, *et seq.*) Plaintiffs' amended complaint named the Benton Harbor district, school board and supervisor; the Governor of the State of Michigan; the Michigan Attorney General; the Michigan State Board of Education and State Superintendent of Public Education; and the neighboring Coloma and Eau Claire school districts.

A detailed review of the facts may be found in two separate opinions of the District Court, 442 F.Supp. 1280 (W.D.Mich. 1977) and 467 F.Supp. 630 (W.D.Mich.1978) which determined the liability of each of the defendants. This Court twice affirmed on liability issues. On May 1, 1981 the District Court entered a detailed and thoughtful remedial order. (Appendix, 64A–164A). Essentially, the order provided for the creation of several magnet schools which, it was hoped, would result in the voluntary desegregation of the Benton Harbor, Coloma and Eau Claire School districts. The District Court found that two goals needed to be met in order for the Court's desegregation plan to be successful:

"(1) Greater numbers of children in Benton Harbor must be educated in desegregated school environments; (2) Benton Harbor children must be provided with increased opportunities for quality educational experiences with professional

and compassionate assistance to enable them to improve their achievement motivation and task performance." (Appendix, 81A)

This Court affirmed the District Court's Remedial Order, including those portions of the Order which provided for the affirmative hiring of black staff by the Coloma and Eau Claire districts.

By the start of the 1981–82 academic year Coloma had hired a few black teachers and staff people. A year later, however, the school district was faced with the prospect of faculty layoffs for economic reasons. Coloma returned to the District Court for clarification of the Remedial Order as it applied to the (newly hired) black staff.

The District Court held a hearing on the matter, during which it was established that of the approximately 140 teachers in the Coloma district, 3 were black. Additionally, Coloma employed, at that time, two black assistant principles, two black liaison staff members and three black aides. It is undisputed that prior to the May 1 Remedial Order Coloma had no black teachers or staff. The Superintendent of the Coloma district testified that a layoff would likely result in the discharge of the black teachers, staff members and aides since they had the least seniority. The Superintendent also stated that it was expected that the layoffs would be permanent, as the district did not anticipate any growth in faculty in the near future.

On October 14, 1982 the District Court issued a supplemental order which is the subject of the instant appeal. The supplemental order found that "those minority teachers hired subsequent to this Court's May 1, 1981 Order are not subject to layoff procedures should Coloma determine that teacher layoffs are required." (Appendix, 168A) The District Court relied heavily on its prior finding that voluntary desegregation would only succeed in Coloma if the district hired some minority faculty. (Appendix, 166A)

The MEA then appealed to this Court seeking to have the October 14, 1982 order

vacated. A panel of this Court remanded the case to the District Court for consideration of whether the controversy was moot when it became apparent that the anticipated layoffs were not imminent.

On January 21, 1985 the District Court found that the October 14, 1982 order was not moot (Appendix, 172A–179A) and that long-range planning by the parties dictated that the order should stand. The District Court found that the controversy was not moot because the question of *future* compliance was still at issue.

Appellant Michigan Education Association now urges this Court to vacate the October 14, 1982 supplemental order and the January 21, 1985 continuing order as moot and/or unnecessary and overbroad.

## II.

At the outset, it is important to note that the sole issue before us is whether that portion of the District Court's continuing order which provides for the suspension of the Michigan Teacher Tenure Act and the seniority provisions of the collective bargaining agreement should be vacated. The liability of the defendant school districts has already been established, as has the right of black school children in Benton Harbor to a meaningful remedy for unlawful desegregation. Additionally, however, it is important to recognize that this is *not* a faculty hiring/promotion discrimination case.

The MEA makes two distinct arguments on appeal. First it argues that since no layoffs are presently threatened the order should be vacated as moot. Second, the MEA insists that nothing in the record demonstrates that the seniority provisions of the collective bargaining agreement need to be suspended in order to remedy the constitutional violations suffered by black Benton Harbor students. Since we dispose of this appeal on the basis of the MEA's first argument, we need not reach the second.

The MEA asserts that this case ought to be controlled by *Boston Firefighters Union, Local 718 v. Boston Chapter NAACP,*

461 U.S. 477, 103 S.Ct. 2076, 76 L.Ed.2d 330 (1983). In *Boston Firefighters,* following a decision of the U.S. Court of Appeals for the First Circuit, which suspended the state's last-hired, first-fired scheme for layoffs, the Massachusetts Legislature enacted legislation which provided Boston with revenues and secured against future layoffs. Thus, by the time the case was before the Supreme Court, it appeared the issue was moot. Appellees attempt to distinguish *Boston Firefighters* on the ground that since "the district court is structuring long-term relationships between parties to a continuing controversy" the continuing order is needed to provide guidance. (Appellee's Brief, 8)

While we are in agreement with the plaintiffs and Coloma that supplemental orders play a necessary and important role in complex school desegregation cases such as this, we are nonetheless mindful that courts should avoid rendering advisory opinions, and limit themselves to deciding actual controversies. *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). This principle is no less true in the context of a school desegregation case.

Although the District Court refers to the "current financial and enrollment problems in our school systems generally," (Appendix, 177A) we find nothing in the record which suggests layoffs are likely to recur. The District Court merely notes that "there is no assurance that ... layoffs will not be considered in the future." (Appendix, 177A). The mere *possibility* that a situation will arise, even in the remedial phase of desegregation litigation, is insufficient to justify orders which are designed, in effect, to protect against conceivable eventualities.

In a school desegregation suit such as this, where important and complex relationships are being restructured, and difficult choices made, knowledge of the particular facts surrounding a layoff are crucial to a fair and equitable remedy. In other words, before approving or modifying a flat prohibition on the layoff of black faculty, the

members of this panel would like to know, for example, who and how many are facing layoffs, why and for how long, and for how many years has the teacher to be laid off worked for the system in comparison to the teachers being retained through affirmative action. This information is simply unavailable to us now. Layoff decisions based on race are extremely sensitive and must be justified by forceful considerations, as the Supreme Court recently noted in *Wygant v. Jackson Board of Education*, — U.S. —, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986):

> "[i]n cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.... [W]hile hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals...."

*Id.* at 1851.

Without knowing the facts of the particular layoff situation, we do not have a case or controversy with the immediacy necessary for an informed decision.

We have no occasion in this decision to rule upon the merits of the MEA's second argument regarding a ban on layoffs of black faculty. That can wait until layoffs are imminent and the facts of a real case are present.

### III.

That portion of the District Court's remedial order which effectively suspends application of the state teacher tenure law and the seniority provisions of the collective bargaining agreement is vacated as moot. The remaining portions of the supplemental and continuing orders are not affected by this decision.

Reversed.