79 F.3d 1273
 151 L.R.R.M. (BNA) 2951, 64 USLW 2692,
131 Lab.Cas. P 11,553
 The NEWSPAPER GUILD OF SALEM, LOCAL 105 OF the NEWSPAPER
GUILD, Plaintiff-Appellant,
v.
OTTAWAY NEWSPAPERS, INC., The Salem News Publishing Company,
Inc., and Essex County Newspapers, Defendants-Appellees.
 No. 95-1878.
 United States Court of Appeals,
First Circuit.
 Heard Oct. 2, 1995.
Decided April 3, 1996.
 
 Appeal from the United States District Court for the District of Massachusetts, Hon. Edward F. Harrington, U.S. District Judge.
 Ruth A. Bourguin, Boston, MA, with whom Lois Johnson and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C. were on brief for appellant.
 Richard A. Perras, Boston, MA, with whom Steven M. Cowley and Edwards & Angell were on brief for appellees.
 Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.
 TORRUELLA, Chief Judge.
 
 
 1
 Plaintiff-Appellant The Newspaper Guild of Salem, Local 105 of the Newspaper Guild, (the "Guild") appeals the district court's denial of its request for injunctive relief against Defendants-Appellees Ottaway Newspapers, Inc., The Salem News Publishing Co., and Essex County Newspapers (together, the "Publisher"). The district court denied the Guild's request for (i) an order compelling the Publisher to submit to arbitration grievances arising under their collective bargaining agreement concerning the Publisher's obligations to bargain a successor agreement and to honor the terms of their present agreement until those negotiations concluded and (ii) an order enjoining the Publisher from laying off members of the Guild, pending resolution of the Guild's grievances. For the following reasons, we dismiss the appeal in part as moot, and affirm in all other respects.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 This case stems from the merger and consolidation of three newspapers. Essex County Newspapers ("ECN"), an unincorporated division of Ottaway Newspapers, Inc., publishes The Beverly Times and The Peabody Times, daily newspapers, from its plant in Beverly, Massachusetts. Effective March 15, 1995, ECN completed its acquisition of The Salem Evening News, a daily newspaper, published in Salem, Massachusetts. This acquisition was completed through the merger of the prior owner, the Salem News Publishing Company, into the Salem News Publishing Company, Inc., a wholly-owned subsidiary of Ottaway Newspapers, Inc. ECN is consolidating the three newspapers into one publication to be called The Salem Evening News. This consolidated daily is to be published from ECN's Beverly facility, which is less than five miles from the less modern Salem plant.
 
 
 3
 The district court noted that this consolidation was the principal reason for ECN's acquisition and that it required a reduction in the work force in order to avoid duplication. For over fifty years, the Guild has been the collective bargaining representative for the employees of the publisher of The Salem Evening News. The most recent collective bargaining agreement between the Guild and the former publisher of The Salem Evening News expired on March 31, 1995 (the "Agreement").[1] Under Article 15 of the Agreement, its terms and conditions remain in effect during negotiations for a successor agreement.[2]
 
 
 4
 In January 1995, the Guild timely initiated negotiations for a successor agreement, and the first substantive bargaining session occurred on March 30, 1995. At that time, the Publisher began negotiations with all of the unions, including the Guild, at the Salem facility and presented the same basic proposal to each: elimination of jobs in Salem due to the consolidation, and layoff severance packages for those employees not offered employment in the consolidated operation. In a letter dated April 14, 1995, the Publisher communicated to the Guild "that [its] proposal is to negotiate a merger/consolidation agreement and not a long-term contract which [it] believe[s] would not be appropriate because a question of representation may be presented." (Appellant's Appendix, p. 143). The next bargaining session took place on May 5, 1995. Seventeen days later, in a letter dated May 22, the Guild notified the Publisher of its grievance that the Publisher was violating Article 15 of the Agreement "by its refusal to bargain a successor Agreement, by its failure to honor all terms and conditions of the current Agreement during the course of negotiations, and by its related conduct...." (Appellant's Appendix, p. 202). Subsequent bargaining sessions occurred on May 25, June 7, and June 13, 1995.
 
 
 5
 Soon thereafter, on June 21, the Guild filed a Demand for Arbitration with the American Arbitration Association, demanding that the Publisher arbitrate the Guild's grievance and that the Publisher be ordered to "bargain a 'new Agreement' within the meaning of Article 15.2, restore all status quo ante conditions pending such negotiations and make all affected employees whole." (Appellant's Appendix, p. 234). Two days later, on June 23, 1995, the Guild launched a double-barrelled attack. First, the Guild filed a Complaint pursuant to Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, as amended,[3] in the U.S. District Court of the District of Massachusetts, seeking injunctive relief in the form of an order compelling the Publisher to submit grievances arising under the Agreement to arbitration as well as a permanent injunction against layoffs of Guild employees in violation of Article 4.5 of the Agreement.[4] Second, it filed an unfair labor practice charge with the National Labor Relations Board (the "NLRB"), pursuant to Section 8 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, as amended, asserting, inter alia, that the Publisher breached its obligations "to bargain collectively in good faith ... by refusing to bargain a successor agreement ... and by insisting instead on bargaining only a 'merger/consolidation' agreement." (Appellant's Appendix, p. 247). The Guild requested essentially the same relief as in its Complaint, including a request that the NLRB pursue an injunction against layoffs. (Appellant's Appendix, pp. 301-03).
 
 
 6
 After a hearing, the district court denied the Guild's motion for injunctive relief on July 24, 1995. The district court ruled that the grievance regarding the scope of negotiations was expressly excepted from the Agreement's arbitration provision, Article 12, which the Guild sought to enforce. The district court, finding that no employee layoffs had occurred during the negotiations, held that should any layoffs occur during negotiations it would entertain a renewed petition to enjoin them. The district court also noted that "[i]f any layoffs should occur after negotiations have been concluded, any unfair labor practice would lie within the jurisdiction of the [NLRB], before which body a case involving the same issues is presently pending."[5] ]
 
 
 7
 On July 28, 1995, the Guild filed this interlocutory appeal. A week later, on August 2, the Publisher notified the Guild that negotiations were at an impasse and that it would implement its final proposals unless the Guild was prepared to meet again or respond with counterproposals before noon on August 7. Having had no response, the Publisher notified the Guild on August 7 that negotiations for a merger/consolidation agreement were concluded and that layoffs would be effective August 21. On August 9, 1995, the Guild filed an amended unfair labor practice charge with the NLRB, challenging, among other things, the Publisher's unilateral declaration of impasse, conclusion of the negotiations and implementation of the layoffs. The Guild then filed an emergency motion with the district court on August 14, 1995, seeking an injunction prohibiting any layoffs pending resolution of this appeal. The emergency motion was denied on August 16, 1995. Two days later, the Guild filed two motions with this court seeking an injunction pending resolution of the appeal and for an expedited appeal. This court denied the former[6] and granted the latter.
 
 
 8
 Before us, then, is the Guild's appeal of the district court's July 24, 1995, order. The Guild argues that the district court erred by not applying the mandatory presumption in favor of arbitration and by failing to compel the Publisher to proceed to arbitration. It requests that the district court's order be reversed. The Guild also argues that the district court abused its discretion by refusing to enjoin the layoff of Guild members and requests that the status quo ante be restored. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a).
 
 DISCUSSION
 
 9
 * As a threshold matter, we must first address the Publisher's motion to dismiss this interlocutory appeal on the grounds that it is moot. The Publisher argues that both aspects of the Guild's appeal--regarding compelling arbitration and enjoining layoffs--has been rendered moot due to developments since the district court's decision; namely, the Publisher's declaration of impasse, the conclusion of the parties' negotiations, and the implementation of layoffs which the Guild sought to enjoin.
 
 
 10
 We address the layoffs first. An appeal from the denial of a motion for preliminary injunction is rendered moot when the act sought to be enjoined has occurred. See, e.g., CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 621 (1st Cir.1995) ("no justiciable controversy exists because this appeal can no longer serve the intended harm preventing function, or, put another way, this court, ... has no effective relief to offer"); McLane v. Mercedes-Benz of N. Am., Inc., 3 F.3d 522, 525 (1st Cir.1993); Oakville Dev. Corp. v. FDIC, 986 F.2d 611, 613 (1st Cir.1993) ("When ... the act sought to be enjoined actually transpires, the court may thereafter be unable to fashion [ ] meaningful [relief]. In such straitened circumstances, the appeal becomes moot."). Here, the actions which the Guild sought to enjoin (the layoffs of employees in the Guild's bargaining unit) have already occurred.
 
 
 11
 The Guild disputes, however, that the layoffs issue is moot, arguing that it falls within the exception to the mootness doctrine; namely, that a case otherwise moot can nonetheless be decided if (1) " 'there [is] a reasonable expectation that the same complaining party [will] be subject to the same action'; and (2) 'the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration.' " Anderson v. Cryovac, 805 F.2d 1, 4 (1st Cir.1986) (quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348-49, 46 L.Ed.2d 350 (1975)). Contrary to the Guild's argument, the denial of the injunction against the layoffs does not fall within this exception.
 
 
 12
 We need not determine whether the second prong of this test is met because the first is not.[7] While the Publisher may determine that additional layoffs are necessary in its post-consolidation operation, "there is no demonstrated probability," Weinstein, 423 U.S. at 149, 96 S.Ct. at 349, that additional layoffs are likely or that Guild members would be among those targeted. Based on the record before us, implementation of the layoffs due to the consolidation is a one-time occurrence. See, e.g., Railway Labor Exec. Assoc. v. Chesapeake W. Ry., 915 F.2d 116, 118-19 (4th Cir.1990) (holding that union's claim for injunctive relief from transfers of railroad lines was mooted by the completion of the transfers), cert. denied, 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991); Seafarers Int'l Union of N. Am. v. National Marine Servs., Inc., 820 F.2d 148, 151 (5th Cir.1987) (holding that sale of virtually whole tugboat fleet and accompanying layoffs is a one-time occurrence). Because there is no basis in the record to suggest that additional layoffs of Guild members are likely to recur, we are unpersuaded by the Guild's claim that "Guild members in the merged operation continue to be at risk of layoff" (Appellant's Memorandum in Opposition to Appellees' Motion to Dismiss Appeal, p. 18). See Berry v. School Dist. of Benton Harbor, 801 F.2d 872, 874 (6th Cir.1986) ("The mere possibility that a situation will arise ... is insufficient to justify orders which are designed, in effect, to protect against conceivable eventualities."); Williams v. Alioto, 549 F.2d 136, 143 (9th Cir.1977) (stating that a mere speculative possibility of repetition of the challenged conduct cannot avoid application of the mootness doctrine), cert. denied, 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981). Furthermore, while a return to the status quo ante is theoretically possible, given that most of the laid-off Guild employees have signed releases in exchange for severance packages, a return to the status quo at this juncture would be, for the most part, meaningless. As for those who have not signed releases, relief is available to them through the NLRB, which has before it the Guild's unfair labor practice charge.
 
 
 13
 Thus, in sum, given that the action which the Guild sought to enjoin has already occurred, and that there is no reasonable expectation that Guild employees will be subject to the same action again, we dismiss the Guild's appeal from the denial of its motion for a preliminary injunction.[8]
 
 
 14
 This, however, does not dispose of the whole appeal as moot. The Publisher also argues that the Guild's appeal regarding the district court's denial of an arbitration order is similarly moot due to the Publisher's declaration of impasse and the conclusion of the parties' negotiations. As there is no dispute that the terms and conditions of the Agreement expired upon the parties' reaching impasse or a new agreement, the Publisher contends that the Guild can no longer obtain the relief sought in its motion--i.e., to compel the Publisher "to honor the terms of the collective bargaining agreement until those negotiations are completed." (Appellant's Appendix, p. 38 (emphasis added)). In response, the Guild argues convincingly that, if it prevails in its contention that the Publisher failed to enter into the contractually required negotiations, then the Publisher's unilateral declaration of impasse is without meaning. Because the Guild makes a colorable argument that it was and is entitled to seek some relief through arbitration, we do not believe that its arbitration request is mooted by the Publisher's unilateral declaration of impasse. Seafarers, 820 F.2d at 152. Thus, we will exercise our jurisdiction to review the district court's order insofar as it deals with the Guild's motion to compel arbitration.
 
 II
 
 15
 Having addressed the motion to dismiss, we turn now to the Guild's appeal regarding the denial of its request for an order compelling arbitration. We scrutinize a district court's decision to grant or withhold an equitable remedy, such as a preliminary injunction, under a relatively deferential glass. Absent mistake of law or abuse of discretion, we will not interfere. See, e.g., Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 875 (1st Cir.1995); Indep. Oil and Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir.1988). In order to obtain an injunction, the Guild must demonstrate first that its grievance is arbitrable; second, that an injunction is necessary to preserve the arbitration; and, third, that irreparable harm and imbalanced hardships would result without the injunction. International Bhd. of Teamsters, Local Union No. 251 v. Almac's, Inc., 894 F.2d 464, 465 (1st Cir.1990).
 
 
 16
 Our task, then, is to decide whether the district court abused its discretion when it denied the Guild's request that it compel the Publisher to submit the Guild's grievance to arbitration. In making this determination, the Supreme Court has established four principles to guide courts in determining whether a labor dispute is arbitrable:[9]
 
 
 17
 Under the first principle, the parties must have contracted to submit the grievance to arbitration. The second principle requires that the court determine whether the contract provides for arbitration of the particular grievance in question. The third principle demands that the court not decide the merits of the grievance while determining the arbitrability of the dispute. Finally, if the contract contains an arbitration clause, a presumption of arbitrability arises.
 
 
 18
 Cumberland Typographical Union 244 v. The Times, 943 F.2d 401, 404 (4th Cir.1991). A party's agreement to arbitrate is a matter of contract construction and whether a dispute is arbitrable under a collective bargaining agreement is a question of law for the court, AT & T Techs., 475 U.S. at 649, 106 S.Ct. at 1418-19, and the court should not decline to order arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Warrior & Gulf, 363 U.S. at 582-83, 80 S.Ct. at 1352-53, quoted in AT & T Techs., 475 U.S. at 650, 106 S.Ct. at 1419. Guided by these principles, then, in determining whether the district court erred when it did not compel arbitration under the arbitration provisions in the parties' collective bargaining agreement, "we must confine our inquiry to 'ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.' " Montgomery Mailers', 827 F.2d at 712 (quoting American Mfg. Co., 363 U.S. at 568, 80 S.Ct. at 1346).
 
 
 19
 Before turning to the Guild's grievances to determine whether they are arbitrable, we must dispose of a threshold issue: whether or not the Publisher is bound by the collective bargaining agreement as a successor employer. Relying on NLRB v. Fin. Inst. Employees, 475 U.S. 192, 202, 106 S.Ct. 1007, 1012-13, 89 L.Ed.2d 151 (1986), and Holly Farms Corp. v. NLRB, 48 F.3d 1360, 1365 (4th Cir.1995), the Publisher argues that as a matter of federal labor law it is not bound by the collective bargaining agreement because there is no "substantial continuity" between its ownership and operation of The Salem Evening News and those of the prior owner. The Guild disagrees, arguing that as a matter of federal labor law under John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 551, 84 S.Ct. 909, 915, 111 L.Ed.2d 898 (1964), the Publisher is bound by the collective bargaining agreement. While the district court did not explicitly decide this issue, we need not resolve the merits of the parties' arguments because it has no effect on the outcome of this appeal. Even assuming that the Publisher was bound, we find that as a matter of law the Guild's grievance is not arbitrable and that, therefore, the district court properly denied the Guild's request for the injunction.
 
 
 20
 We turn, then, to the arbitrability of the Guild's grievance and to our reasons for not finding it arbitrable. The Guild's grievance is as follows:
 
 
 21
 The Publisher has violated and continues to violate the Agreement by its refusal to bargain a successor Agreement, by its failure to honor all terms and conditions of the current Agreement during the course of negotiations, and by its related conduct, all in violation of Art. 15 and related provisions of the collective bargaining agreement.
 
 
 22
 (Appellant's Appendix, pp. 202 & 234). Article 15.2 of the Agreement provides, in relevant part, that "the Publisher or the Guild may initiate negotiations for a new Agreement to take effect April 1, 1995" and that "[t]he terms and conditions of this Agreement shall remain in effect during such negotiations." (Appellant's Appendix, p. 202). In its Demand for Arbitration, the relief the Guild requests is to "[o]rder the Employer/Publisher to bargain a 'new agreement' within the meaning of Article 15.2, restore all status quo ante conditions pending such bargaining and make all affected employees whole." (Appellant's Appendix, p. 234). The Publisher argues, however, that what the Guild seeks to arbitrate is explicitly beyond the scope of the arbitration provisions in the Agreement, upon which the Guild's motion to compel arbitration relies. Those provisions provide, in relevant part, as follows:
 
 ARTICLE 12. Grievance Committee
 
 23
 12.1 The Guild shall designate a committee ... to take up with the Publisher or its authorized agent any matter arising from the application of this Agreement or affecting the relations of the employees and the Publisher.
 
 
 24
 12.2 Any such matter, except renewal of this contract, not satisfactorily settled within a reasonable period of its first consideration may be submitted to final and binding arbitration by either party....
 
 
 25
 (Appellant's Appendix, p. 61). The Publisher argues that the Guild's request is directly related to contract renewal and, when unveiled, is essentially a request for "interest arbitration."[10] The district court did not err in denying the Guild's request, the Publisher concludes, because it is explicitly prohibited by the terms of the Agreement.
 
 
 26
 While the Guild concedes that "interest arbitration" is prohibited by Article 12.2's contract renewal exclusion, it nonetheless insists that it is not seeking to compel the Publisher to engage in interest arbitration; but rather, that it "is seeking to have an arbitrator determine whether the Publisher has unduly limited the scope of the negotiations for a successor agreement, in violation of Article 15.2 of the contract." (Appellant's Brief, p. 22). The Guild explains that the arbitrator would not be dictating the terms of the successor agreement; instead, it would be determining "whether Article 15.2 imposes an obligation on the Publisher to negotiate in good faith on a broader range of topics." (Appellant's Brief, p. 26). The Guild contends that the district court's critical error was its failure to distinguish between the obligation to bargain in good faith and the obligation to agree to specific terms. The Guild claims that the district court, while properly recognizing that the Guild only sought to have an arbitrator require the Publisher to enter into bargaining for a new agreement, erroneously concluded that "[s]uch a request is beyond the scope of the arbitration clause in the old agreement which specifically excludes contract renewal as a proper issue for arbitration." In turn, the Publisher contends that the Guild's "distinction" is but a "semantic dance" when the case is put in its full context. The Publisher contends that for an arbitrator to rule that the Publisher must engage in negotiations that are broader in scope--i.e., renewal--effectively amounts to the arbitrator deciding the "renewal of the contract" which is expressly excluded under Article 12. Because the term or length of a collective bargaining agreement is one of the more substantive provisions, the Publisher claims this is nothing less than a form of interest arbitration.
 
 
 27
 We agree with the Publisher and, thus, find neither mistake of law nor abuse of discretion in the district court's conclusion. Not only is the plain language of Article 12 clear and unambiguous in stating that contract renewal is not an arbitral matter, we are also unpersuaded by the Guild's claim that it asks not for "interest arbitration" but rather for an arbitrator to merely decide its rights under the Agreement. Without deciding whether a meaningful distinction can ever be made between the terms of a new agreement and the scope of the negotiations thereto, or whether this distinction is but a "semantic dance" performed by the Guild,[11] we find that here there is none. In this case, as a practical matter, it is not possible for an arbitrator to issue an award defining the scope of the negotiations for a new contract without substantively impacting the new contract and its terms and conditions. Because the scope of the negotiations is part of the negotiating process towards a new agreement, the arbitrator would necessarily be making a determination involving "renewal of this contract" were it to define the scope. Thus, although interest arbitration goes only to the terms of the agreement rather than to the negotiations itself, the district court neither erred nor abused its discretion when it concluded that the Guild's grievance amounted to "interest arbitration" and was, therefore, a non-arbitral grievance under the plain language of Article 12's exclusion.
 
 
 28
 In this regard, we find the Guild's reliance on Inner City Broadcasting Corp. v. AFTRA, 586 F.Supp. 556 (S.D.N.Y.1984), and Cumberland Typographical Union 244 v. The Times, 943 F.2d 401, 406 (4th Cir.1991), to be misguided. First, in Inner City, the court found that where "AFTRA has claimed that Inner [City] violated a specific provision of the [agreements] requiring it to negotiate a new agreement in good faith.... [t]here is ... a dispute between the parties as to 'the interpretation or breach' of the [agreements]." Id. at 561. This, the court held, "must be resolved by the method agreed to by the parties, namely arbitration." Id. Central to the court's holding was its finding that AFTRA's grievance fell squarely within the arbitration provision at issue which expressly provided that "any controversy or dispute arising with respect to this contract or the interpretation or breach thereof ... shall be settled by arbitration." Id. In contrast, the Guild's grievance and the relief it seeks--"to bargain a 'new agreement' within the meaning of Article 15.2"--goes directly to renewal of the collective bargaining agreement and thus falls outside the scope of the arbitration provision which expressly excludes contract renewal as a proper issue for arbitration.
 
 
 29
 Second, in Cumberland, the court upheld the union's right to arbitrate a dispute which arose under the parties' expired collective bargaining agreement concerning that agreement's lifetime job guaranty provision. The dispute was about whether the lifetime job guarantee provision at issue prevented dramatic wage decreases during the pendency of negotiations for a new agreement. Central to the court's decision was the fact that "the 'new contract' provision has a direct and substantial effect upon a vested arbitrable right," Cumberland, 943 F.2d at 407, and that the union "[was] not seeking a 'future collective bargaining agreement' through arbitration ..., but enforcement of the existing continuing job guarantee agreement." Id. at 406. In contrast, here, the Guild's grievance about the Publisher's alleged closed mind regarding negotiating a successor agreement does not involve a vested arbitrable right as contract renewal is explicitly excluded under the plain language of Article 12. In other words, when unveiled, the Guild's grievance is essentially concerned with the acquisition of future rights--through a renewed agreement--and is, thus, but a form of "interest arbitration." Accordingly, were we to grant the Guild's request, we would be compelling matters of contract renewal to arbitration--in blatant contradiction of the Agreement's plain language.
 
 
 30
 Indeed, because renewal of the agreement is not a permissible topic for arbitration, we fail to see what there is for the arbitrator to determine other than, as the Guild suggests, whether the Publisher came to the negotiating table in good faith or with a closed mind. While this question, which stems from the Publisher's refusal to negotiate renewal of the agreement after negotiations were timely initiated by the Guild, may involve a question of unfair labor practice, it does not involve a vested arbitral right under the plain language of Article 12. Cf. Montgomery Mailers', 827 F.2d at 715-16 (concluding that the formation of any new agreement is beyond the scope of the arbitration clause where the contract expressly provides that any new agreement is to be arrived at through negotiation).
 
 
 31
 To recapitulate, the Guild's grievance is not arbitrable both by the plain language of the Agreement explicitly excluding "renewal of this contract" and by the Guild's very own concession that Article 12(2) was intended to exclude interest arbitration. Thus, because we find "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," Warrior & Gulf, 363 U.S. at 582-83, 80 S.Ct. at 1352-53, and because there are no doubts to be resolved in favor of arbitration,[12] we find no error or abuse of discretion in the district court's denial of the Guild's request for a permanent injunction compelling arbitration regarding negotiations for a successor agreement, and affirm its order in this respect.
 
 
 32
 Finally, we address the Guild's claim that "certain aspects of its Article 15 grievance do not depend on a predicate finding that the Publisher has refused to negotiate a successor agreement, and therefore cannot even arguably implicate the 'contract renewal' exception to the arbitration clause.... [and that,] [t]herefore, the Publisher must at least be compelled to arbitrate those aspects of the arbitration demand." (Appellant's Brief, p. 34 n. 12). After careful review of the record, however, we find that these issues which the Guild claims were part of its grievance were never squarely presented to the district court.[13] Because they were not squarely presented below, the Guild may not raise them for the first time in their interlocutory appeal. See, e.g., Teamsters, Chauffeurs Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir.1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."); McCoy v. Massachusetts Inst. of Tech., 950 F.2d 13, 22 (1st Cir.1991) ("If claims are merely insinuated rather than actually articulated in the trial court, we will ordinarily refuse to deem them preserved for appellate review."), cert. denied, 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992); Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir.1988) ("A litigant has an obligation 'to spell out its arguments squarely and distinctly' ... or else forever hold its peace.").
 
 III
 
 33
 The Guild argues that the district court erred when it concluded that "[i]f any layoffs should occur after negotiations have been concluded, any unfair labor practice would lie within the jurisdiction of the [NLRB], before which body a case involving the same issues is presently pending." The Guild claims that the district court erroneously agreed with the Publisher's argument below that the NLRB has primary jurisdiction over the issue of whether the Publisher had fulfilled its contractually imposed bargaining obligations, including whether the parties were at impasse in the negotiations. The crux of the Guild's argument is that, because its claims arise solely under the Agreement and are on appeal solely pursuant to section 301 of the LMRA, this case lies within the concurrent jurisdiction shared by the federal courts and the NLRB.
 
 
 34
 We review de novo the district court's implicit jurisdictional finding that the Guild's claims fall within the primary jurisdiction of the NLRB. See Int'l Bhd. of Teamsters, Chauffeurs v. American Delivery Serv., Co., 50 F.3d 770, 770 (9th Cir.1995). It is well-settled that the NLRB enjoys primary jurisdiction over disputes involving unfair labor practices or representational issues. See Tamburello v. Comm-Tract Corp., 67 F.3d 973, 976 (1st Cir.1995) (discussing how the "NLRA vests the NLRB with primary jurisdiction over unfair labor practices"). It is also a " 'well entrenched general rule' ... that 'the fact that a particular activity may constitute an unfair labor practice under section 8 of the LMRA, 29 U.S.C. § 158, does not necessarily preclude jurisdiction under section 301 of the [LMRA] if that activity also constitutes a breach of the collective bargaining agreement.' " Local Union No. 884 v. Bridgestone/Firestone, Inc., 58 F.3d 1247, 1256 (8th Cir.1995) (quoting Local Union 204 of the Int'l Bhd. of Elec. Workers v. Iowa Elec. Light and Power Co., 668 F.2d 413, 416 (8th Cir.1982)); see William E. Arnold Co. v. Carpenters Dist. Council, 417 U.S. 12, 15-16, 94 S.Ct. 2069, 2071-72, 40 L.Ed.2d 620 (1974).
 
 
 35
 While we agree with the Guild that where a party's conduct gives rise to both a charge of an unfair labor practice and a claimed breach of a collective bargaining agreement the NLRB and the district court share "concurrent jurisdiction," Local Union No. 884, 58 F.3d at 1257, we nonetheless find no error in the district court's order. The reason, in a nutshell, is because we conclude that the Guild's complaint falls more appropriately within the NLRB's primary jurisdiction than within the concurrent jurisdiction shared with the federal courts.
 
 
 36
 First, we do not find that it involves a bona fide contractual dispute arising out of a breach of the Agreement. While we have not found case law explicitly holding so, the doctrine of concurrent jurisdiction applies only where the conduct involves a bona fide claimed breach of the collective bargaining agreement. Were this not the case, the primary jurisdiction of the NLRB could be circumvented simply by casting statutory claims as contractual or constitutional violations. Cf. Communications Workers v. Beck, 487 U.S. 735, 742-44, 108 S.Ct. 2641, 2647-48, 101 L.Ed.2d 634 (1987) ("Employees, of course, may not circumvent the primary jurisdiction of the NLRB simply by casting statutory claims as violations of the union's duty of fair representation."); Amalgamated Clothing & Textile Workers Union v. Facetglas, Inc., 845 F.2d 1250, 1252 (4th Cir.1988) ("There is a strong policy in favor of using the procedures vested in the [NLRB] for representational determinations ... and '[t]o fail to apply this policy to section 301 actions would allow an 'end run' around provisions of the NLRA under the guise of contract interpretation.' " (quoting Iowa Elec., 668 F.2d at 418-19)).
 
 
 37
 We are unpersuaded by the Guild's claim that the Publisher's refusal to negotiate a successor agreement and its insistence on only negotiating a "merger/consolidation" agreement constitutes a breach of Article 15.2. While the Guild may not be satisfied with the "scope" or progress of the negotiations it initiated under Article 15.2 or with the Publisher's good faith, the Publisher's conduct does not give rise to a claimed breach of the collective bargaining agreement, because Article 15.2 neither mandates renewal nor delineates the scope of the negotiations; rather, it merely provides that either the Publisher or the Guild may timely initiate negotiations for renewal. Thus, because the Publisher's conduct does not give rise to a colorable breach of the Agreement, it does not fall within the "concurrent jurisdiction" shared by the federal courts and the NLRB. See Steinmetz Elec. Contrs. Assoc. v. Local Union No. 58, Int'l Bhd. of Elec. Workers, 517 F.Supp. 428, 436 (E.D.Mich.1981) ("Though it cannot be disputed that the courts and the [NLRB] [share] concurrent jurisdiction ... when a matter in dispute is not an issue under a contract, then the courts are without jurisdiction."). To hold otherwise would permit the Guild to style what is in essence an unfair labor practice claim as an section 301 claim in order to get contract renewal issues, including the issue of impasse, before an arbitrator. Cf. Local Union No. 884, 58 F.3d at 1257 (rejecting characterization that union's claim was "really a subterfuge ... to get the issue of 'bargaining impasse' before an arbitrator" where union's claim, regarding whether disputed rights survived expiration of collective bargaining agreement, was in fact subject to contract's arbitration provisions).[14]
 
 
 38
 Second, we are swayed by the fact that the Guild's section 301 claim is premised on the same set of facts which generated its unfair labor practice charge before the NLRB, requires resolution of the same issues, and requests the same relief. While the pendency of similar issues before the NLRB and the court, does not require dismissal or stay of a section 301 contract action, see Local Union No. 884, 58 F.3d at 1257 (citations omitted), courts may decline to act where the issues presented fall within the scope of the NLRB's primary jurisdiction, as primary jurisdiction stems from the judiciary's deference to an administrative agency's expertise, see, e.g., United States v. Western Pac. R.R. Co., 352 U.S. 59, 63-64, 77 S.Ct. 161, 164-65, 1 L.Ed.2d 126 (1956); United Food and Commercial Workers, Local 400 v. Marval Poultry, 708 F.Supp. 761, 764 (W.D.Va.1989). Indeed, "[c]onsideration of the history and purposes of the primary jurisdiction doctrine convinces us that district courts should not serve as the initial arbiters of unfair labor practice charges in section 301 actions." Waggoner v. R. McGray, Inc., 607 F.2d 1229, 1235 (9th Cir.) (reviewing doctrine and concluding that it mandates the holding that district courts may not decide, independent of the NLRB, the merits of an unfair labor practice defense to enforcement of a collective bargaining agreement in a section 301 action), reh'g denied, (1979).
 
 
 39
 Here, the gravamen of the Guild's complaint is that the employer bargained in bad faith, unlawfully reached impasse, and unlawfully undermined the Guild's representational status. These issues fall squarely within the NLRB's primary jurisdiction as they are essentially extra-contractual claims regarding the Publisher's duty to bargain in good faith, its conduct during negotiations and the resulting damage to the Guild's representational status. 29 U.S.C. § 158. Accordingly, we find no error in the district court's conclusion that any unfair labor practice charge would fall within the NLRB's jurisdiction once negotiations concluded. Finally, we merely add that, even if the Guild's claims constituted a legitimate section 301 claim, we would nonetheless find no abuse of discretion in the district court's decision to defer to the NLRB's jurisdiction. Cf. Marval Poultry Co., 708 F.Supp. at 764 (deferring to the NLRB while recognizing that the district court's jurisdiction of the union's section 302 claim was "not preempted per se ").
 
 IV
 
 40
 For the foregoing reasons, the judgment of the district court is dismissed in part as moot[15] and affirmed in part.
 
 
 
 [1]
 By its original terms, the Agreement was to expire on September 30, 1994; but, it was extended until March 31, 1995, by agreement of the parties. The Guild contends that the Agreement was extended because of the then pending acquisition and due, in part, to the Publisher's representations that a "new Agreement" would contain enhancements or improvements of the existing Agreement
 
 
 [2]
 ARTICLE 15. Duration and Renewal
 
 
 [15]
 1 This Agreement shall commence on the 9th day of November, 1993, and expire on the 30th day of September, 1994, and shall inure to the benefits of and be binding upon the successors and assigns of the Publisher
 
 
 [15]
 2 Within eighty (80) days, and not less than thirty (30) days prior to the termination of this Agreement, the Publisher or the Guild may initiate negotiations for a new Agreement to take effect April 1, 1995, the new contract shall be made retroactive to September 30, 1994
 
 
 [3]
 Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."
 
 
 [4]
 Article 4.5 provides that "[t]here shall be no dismissal of employees in the Guild jurisdiction for economy or as a result of new or modified processes or equipment."
 
 
 [5]
 In a letter dated August 1, 1995, the American Arbitration Association notified the parties that "[g]iven the courts position regarding the arbitrability of the matter as stated in their opinion dated July 25, 1995, the Association will not proceed with administration of this matter without the consent of the parties or a court order." (Appellant's Appendix, p. 293)
 
 
 [6]
 The record shows that of the seventy-five (75) Guild employees, thirty-seven (37) have been fully integrated into the new consolidated The Salem Evening News. (Appellant's Appendix, pp. 273 & 296). The Publisher states, and the Guild does not dispute, that of the thirty-eight (38) that were laid off effective August 21, thirty-two (32) executed full releases of all claims relating to their employment and termination in consideration for severance packages
 
 
 [7]
 As to the second prong, we note that because the layoffs challenged by the Guild remain in effect and are the subject of the Guild's unfair labor practice charge pending before the NLRB, the Guild will have an opportunity to fully be heard regarding the propriety of those layoffs despite the dismissal of this aspect of the appeal as moot
 
 
 [8]
 Because we have dismissed this aspect of the appeal as moot, we do not need to address the Publisher's claim that the Guild withdrew its request for a preliminary injunction against the layoffs nor resolve whether or not the denial of the injunction against the layoffs is properly before us
 
 
 [9]
 The four principles derive from the Steelworkers Trilogy, the collective name given to three Supreme Court cases decided in 1960--Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)--which are still considered the foundation of any decision involving arbitration imposed by a collective bargaining agreement. See AT & T Techs., Inc. v. Communications Workers of America, 475 U.S. 643, 648-51, 106 S.Ct. 1415, 1418-20, 89 L.Ed.2d 648 (1986) (discussing the Steelworkers Trilogy); Montgomery Mailers' Union No. 127 v. The Advertiser Co., 827 F.2d 709, 712-13 (11th Cir.1987) (same)
 
 
 [10]
 Two categories of labor arbitration have been distinguished: (i) "grievance arbitration" which concerns disputes over the terms of existing contracts and (ii) "interest" or "new contract" arbitration which allows for arbitration of the terms of a new agreement. See Montgomery Mailers', 827 F.2d at 716 n. 7; Local Div. 589, Amalg. Transit Union v. Massachusetts, et al., 666 F.2d 618, 620 (1st Cir.1981) ("Unlike 'grievance arbitration,' which involves the interpretation and application of existing contractual provisions, 'interest arbitration' involves the creation of new substantive contractual terms, which will govern the parties' future relations."). See also Silverman v. Major League Baseball Player Rels. Comm., Inc., 67 F.3d 1054, 1062 (2d Cir.1995) (" 'Interest arbitration' is method by which employer and union reach new agreements by sending disputed issues to an arbitrator rather than settling them through collective bargaining and economic force."); Coca-Cola Bottling Co. v. Soft Drink and Brewery Workers Union, Local 812, 39 F.3d 408, 410 (2d Cir.1994) (noting that in NLRB v. Sheet Metal Workers Local 38, 575 F.2d 394, 398-99 (2d Cir.1978) it reasoned that an "interest arbitration provision" would be void as contrary to public policy to the extent that it applied to nonmandatory bargaining subjects because a contrary ruling would impair the parties' freedom to exclude nonmandatory subjects from bargaining)
 
 
 [11]
 We also note that the Guild's argument may not necessarily be a "semantic dance" given that the parties could have negotiated the impasse and be where they are today
 
 
 [12]
 Because we find the Guild's grievance not arbitrable, we need not address the remaining two prongs that it had to demonstrate in order to obtain an injunction
 
 
 [13]
 While the Guild made reference to "grievances" below, it only identified two additional grievances--neither of which are arbitrable at this point--despite repeated requests by the district court during the hearing on its motion for injunctive relief to specify exactly what it wanted to have referred to an arbitrator. The first, regarding whether the terms and conditions of the Agreement remain in effect, is a judicial function which the district court correctly noted was to be resolved by the court prior to compelling arbitration. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-47, 84 S.Ct. 909, 912-13, 11 L.Ed.2d 898 (1964) (noting that threshold question of who should decide whether the provisions survived the merger so as to be binding was a question for the courts); Int'l Bhd. of Electrical Workers, Local 1228 v. Freedom WLNE-TV, Inc., 760 F.2d 8, 9 (1st Cir.1985) ("Generally it is up to the court to determine, in the first instance, whether the parties have entered into a contract ... and whether that contract is still binding upon them."). The second, regarding whether those terms and conditions, particularly Article 4.5, preclude layoffs of Guild members prior to lawful impasse or the conclusion of negotiations, was rendered premature below (by the Guild's own admission) given the Publisher's representation that no layoffs would occur prior to reaching lawful impasse or while negotiations continued
 
 
 [14]
 Because we conclude that concurrent jurisdiction does not exist in this case, we do not need to address the Publisher's contention, and the Guild's rebuttal, that the Guild's claims are "primarily representational" and, thus, within the primary jurisdiction of the NLRB. See Local Union 204, 668 F.2d at 419 ("We believe the appropriate line between those cases where the district court has jurisdiction under section 301 and those in which it does not is to be determined by examining the major issues to be decided as to whether they can be characterized as primarily representational or contractual.")
 
 
 [15]
 As a general rule, when a case becomes moot on appeal--or an aspect thereof--we vacate the district court's decision and remand with a direction to dismiss. See, e.g., McLane v. Mercedes-Benz of North America, Inc., 3 F.3d 522, 524 n. 6 (1st Cir.1993) (citing United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950)). In the case of an interlocutory appeal, however, the usual practice is simply to dismiss the appeal as moot rather than vacate the order. See McLane, 3 F.3d at 524 n. 6 (citing cases)